Filed 5/20/15; pub. order 6/19/15 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CARL SCHAFER, Individually and as Trustee, etc. et al., | B253935 |
| Petitioners and Respondents, | (Los Angeles County Super. Ct. No. BS137297) |
| v. | |
| CITY OF LOS ANGELES, | |
| Defendant and Appellant; | |
| TRIANGLE CENTER, LLC, | |
| Real Party in Interest and Appellant. | |

APPEALS from a judgment of the Superior Court of Los Angeles County, Joanne B. O'Donnell and Robert H. O'Brien, Judges. Affirmed.

Michael N. Feuer, City Attorney, Terry P. Kaufmann Macias, Assistant City Attorney, and Amy Brothers, Deputy City Attorney for Defendant and Appellant, City of Los Angeles.

Jeffer, Mangels, Butler & Mitchell, Benjamin M. Reznik and Matthew D. Hinks for Real Party in Interest and Appellant.

John A. Henning, Jr., for Petitioners and Respondents.

Triangle Center, LLC (Triangle Center) and the City of Los Angeles (City) appeal from a judgment in favor of Carl Schafer, individually and as trustee of the Schafer Trust dated October 3, 2000, and Elizabeth Leslie (collectively Petitioners). The trial court granted a peremptory writ of mandate directing the City to set aside a decision by the City's planning commission that upheld a building permit allowing the restriping of a parking lot owned by Triangle Center and to reinstate a decision by the City's zoning administrator that denied the permit. Triangle Center and the City contend the evidence supports the planning commission's decision that the City is equitably estopped from disallowing use of the property as a parking lot, and the trial court erred by concluding that the circumstances here do not justify an equitable estoppel against the City.

We conclude that, regardless of whether the elements of equitable estoppel are satisfied, the circumstances here do not justify an equitable estoppel against the City. This is not one of the rare and exceptional cases in which denying equitable estoppel would result in grave injustice. Allowing Triangle Center to establish land use rights contrary to the zoning restrictions and despite its failure to comply with the normal land use approval process would adversely affect public policy and the public interest. That adverse impact outweighs any unfairness to Triangle Center resulting from the failure to apply equitable estoppel. We therefore affirm the judgment granting a writ of mandate in favor of Petitioners.

### FACTUAL AND PROCEDURAL BACKGROUND

1.    *Factual Background*

Petitioners own two single family residences located at 3981 and 3985 South Meier Street in the City. Triangle Center owns real property located at 3984 and 3988 South Meier Street (lots 70 and 71) in the City that has been used for many years as a commercial parking lot. Across an alley from lots 70 and 71 lies property in the City of Culver City, including lot 69.

The City changed the zoning of lots 70 and 71 in 1956 from R4 (multiple dwelling) to R4P (multiple dwelling or parking) based on the planning commission's

2

determination that there was a need for additional off-street parking facilities in the area and that the property was "ideally situated for the proposed use since it is bounded on two sides by public streets and on the third by a public alley."

Members of the Hochman family owned lots 69, 70, and 71 in 1957.[1] They operated a retail market on lot 69. They entered into a written agreement with Culver City in December 1957 stating that they would use lots 70 and 71 for parking for the market as long as the market continued to operate. A certificate of occupancy was issued for the market on lot 69 in 1946, but no certificate of occupancy was issued for the parking lot on lots 70 and 71.

The City issued permits in 1978 and 1980 allowing the sale of Christmas trees on lot 71. The permits make no mention of the lot's status as a parking lot. In 1987, the City issued an order to comply stating that lot 71 was being used illegally for a can-crushing machine and a storage trailer. Someone – presumably a City representative – wrote the words "parking lot" on a line entitled "[a]pproved use." The City's Department of Building and Safety inspected the property, determined that use of the property for a can-crushing machine was legal but the storage trailer use was not, and closed the file after the storage trailer was moved to the Culver City side of the business.

In 1988, the City changed the zoning of lots 70 and 71 from R4P (multiple dwelling or parking) to R3 (multifamily residential).

The City issued another order to comply in 1996 stating that lot 70 was being used illegally for storage of abandoned vehicles and recyclable materials. Again, under "[a]pproved use," an inspector wrote "parking lot" (capitalization omitted). The Department of Building and Safety inspected the property, the items were removed, and the file was closed in 1997.

---

[1] Members of the Hochman family purportedly have owned or managed lots 69, 70, and 71 continuously since 1957. Bess Hochman described herself as "one of the current managing partners" and "the daughter of one of the original owners of the property."

3

In 2000, the City issued a building permit for lots 70 and 71 allowing the restriping of the parking lot. The application for the permit stated under "Application Comments" (capitalization omitted), "Per Jeff McIntyre parking lot has deemed approved conditional use status based on covenant and agreement submitted indicating that parking is required for building in Culver City and zone change in 1957 to change zone to R4P. Zone has since been changed to R3. Restripe of parking lot ok provided number of stalls is not increased. Parking lot has been in existence since 1957."[2]

An architect hired by Petitioners complained to the City in 2009 that the property was being used as a parking lot without a permit. The City issued orders to comply for lots 70 and 71 in April 2009 stating, "The empty lot has been occupied without first obtaining the required Certificate of Occupancy." The orders stated that the use must be discontinued without a required certificate of occupancy. In May 2009, the assigned inspector wrote that he had been told by a superior that because "the parking lot was built when this property was zoned R4P" and the Department had approved the restriping in 2000, the bureau chief "considers this an existing non-conforming use which does not require a permit or Certificate of Occupancy." The Department then closed the file.

2.    *Administrative Proceedings*

Petitioners filed an administrative appeal in August 2010 challenging the 2000 issuance of the restriping permit. The Department of Building and Safety determined that the parking lot was a legal nonconforming use and denied the appeal.

Petitioners appealed the decision to the City's planning director. The planning director assigned zoning administrator Lourdes Green to the matter. Green held a public hearing on June 14, 2011. Neighbors of the parking lot submitted letters and e-mails in support of the appeal. One family wrote they had been members of the community for more than 16 years and could not allow their children to play outside because of vagrancy associated with the parking lot. A representative of the Mar Vista

---

[2]    According to Triangle Center's consultant, Jeff McIntyre was a senior official in the Department of Building and Safety.

4

Community Council Board of Directors -- the neighborhood council for the area -- testified in support of Petitioners' appeal. The Mar Vista board also submitted a letter stating its unanimous support for the appeal and noting that "the 99 Cent Store [should] obtain a Conditional Use Permit for its Parking lots."[3] A representative of the office of the City Councilmember for the district also "testified that the office was in support of the appeal." Triangle Center did not appear at the hearing but its property agent later sent Green a letter stating the lot was "in compliance as of May 12, 2009" and including documents about the zoning change in 1956 to allow parking. Triangle Center did not raise any claim of estoppel.

On September 15, 2011, Administrator Green issued a written decision finding the Department of Building and Safety had erred in determining the parking lot had legal nonconforming use as of 1958 and therefore in issuing the restriping permit in 2000. Green noted that, since at least 1946, the City's zoning code has required a certificate of occupancy for the "use of land," including "the use of land as a parking lot." Apparently referring to Triangle Center's written agreement with Culver City, Green stated the Municipal Code does not permit "an agreement recorded with the County to be considered as a basis for the establishment of a legal nonconforming status superseding" the Code's requirements. The administrator therefore granted Petitioners' appeal.

Triangle Center appealed the zoning administrator's decision to the City's planning commission. In an "attachment" to its appeal, Triangle Center argued it had legal nonconforming rights for the parking lot. Triangle Center also asserted "alternatively the City [is] estopped from determining the 50 year use of the parking lot is not legal."

The planning commission held a public hearing on January 18, 2012. No one from the city attorney's office attended the hearing. At the outset, Administrator Green detailed all of her work on the case, her findings, and the reasons for her conclusion.

---

[3]    Triangle Center never has had a conditional use permit for the parking lot. Triangle Center's counsel stated at oral argument that it has now applied for one.

5

Green noted that Triangle Center "has options. The property owner has the option of filing [for] a conditional use to allow public parking in the [residential] zone." Administrator Green then answered a number of questions from the commissioners. The administrator said she had "researched the pertinent provisions, read old municipal code books, [gone] through all our archives to find the old books, . . . [and] found that as far back as 1946, the code required a certificate of occupancy . . . for the use of vacant land or [a] change in the character of the use of [the] land." A number of neighbors and other interested parties testified at the hearing, both for and against the appeal. Triangle Center submitted hundreds of form memoranda signed by Los Angeles County residents, some from as far away as Studio City, Inglewood, and Sylmar. The form memos said, "I support the continued use of the parking lot at 3984-3988 Meier Street which provides parking for the 99 cents store. . . . Disallowing the continued historical use of parking at this site would result in negative impacts of on-street parking, noise and other nuisances within our neighborhood. In addition, it would open the door for a high density apartment development that would be allowed under the existing zoning that would bring more traffic and negative impacts."[4] One version of the memo also said, "I am in favor of the property owner's . . . proposed landscape plan to add more street trees along Meier Street and a 5 ft. hedge or wall adjacent [to] the parking lot on Meier Street and support the property owner's offer to install and maintain such landscaping as a condition for granting the proposed appeal in this matter."[5] Yet another version of the form memo said, "The parking area at the store helps to alleviate the street parking problems created by the development of so many multiunit condos and apartments in the area. . . . I would not mind seeing some

---

[4]    There is no evidence in the record that Triangle Center planned to build a "high density apartment development" on Lots 70 and 71.

[5]    There is no evidence in the record that Triangle Center has added trees or a five-foot hedge or wall. Zoning Administrator Green pointed out -- and the planning commission acknowledged -- that it could not legally make any such mitigation a condition of granting Triangle Center's appeal.

6

additional landscaping around the back parking lot on Meier but not if it decreases the available parking in the existing parking lot."

Most people left the "Additional Comments" section blank. Some expressed concerns about the possibility of "high density apartment development." Others said the 99 Cent Store provided low-cost shopping for residents. Some wrote that "having that parking lot takes [the] pressure [off] having a lot of cars on our block." Still others wrote that police should patrol more often and the neighborhood needed more trees.

After the conclusion of testimony, commissioner Thomas M. Donovan stated that the "only way" to reverse the zoning administrator's decision was to find that the City was equitably estopped from disallowing use of the property as a parking lot. He said that he believed that the elements of equitable estoppel were satisfied. But, he noted, a decision based on equitable estoppel would not allow the City to impose conditions -- such as landscaping -- for the benefit of the neighborhood.

Commissioner Donovan stated the planning commission should find that (1) the City knew or should have known there was no certificate of occupancy for the property; (2) despite at least two property inspections in connection with other violations, the City never told the owners that a certificate of occupancy was required and its representatives listed "parking lot" as an approved use; moreover, the City knew or should have known that its failure to notify the owners that a certificate of occupancy was lacking would cause them not to apply for a certificate of occupancy when they had a right to receive one on request; (3) Triangle Center did not know that it lacked a required certificate of occupancy; and (4) Triangle Center relied on the City's representations and inaction by not seeking a certificate of occupancy before 1988 (when the City changed the zoning to R3) and by restriping the parking lot.

Commissioner Donovan said the planning commission also should find that the injustice to the owner resulting from a failure to apply equitable estoppel would outweigh the public policy and public interest in adhering to the City's zoning laws, that the case was unlikely to establish any precedent, and that a loss of off-street parking

7

could harm the neighborhood. The planning commission voted three-to-one to grant the appeal, upholding the restriping permit.

In February 2012 the planning commission issued written findings. The commission listed "general points" made by those testifying for and against the appeal at the hearing. The commission then stated it had "determined that the elements of equitable estoppel regarding municipalities were the only means to reverse the action of [the] Zoning Administrator on this matter." The commission wrote that the requirements for equitable estoppel had been met. The commission said Triangle Center was "ignorant of the need" for a certificate of occupancy and that "this resulted in an injustice to the property owner which outweighs public interest and City policy" requiring certificates of occupancy. The commission stated the parking lot was "part of the character of the neighborhood" and that its loss "could cause an impact to the immediate neighborhood by creating other impacts such as increased traffic and parking problems." The commission concluded that its decision was "unlikely to set a precedent" because the Triangle Center situation was "not considered a likely scenario" and therefore the commission's action "would not affect public interest or the City's policy" concerning zoning laws.

3. *Petition for Writ of Mandate*

Petitioners filed a combined petition for writ of mandate and complaint followed by a first amended petition and complaint in May 2012. They alleged in their count for a writ of mandate (1) that a certificate of occupancy was required but was never obtained for the parking lot, and (2) that the parking lot was not a legal nonconforming use because it never conformed to the requirements of the applicable land use regulations. They alleged that the planning commission abused its discretion by granting Triangle Center's appeal and upholding the restriping permit because the commission's findings did not support its decision, the evidence did not support its findings, and its decision violated Los Angeles Municipal Code section 12.10, which prohibits use of the property as a commercial parking lot.

8

The trial court granted the petition after a hearing on the merits. The court concluded that substantial evidence supported the planning commission's finding that the City should have known that the property lacked a required certificate of occupancy. The court concluded, however, that an equitable estoppel against the government relating to land use laws could be based only on affirmative conduct by the government, not inaction. The court also stated that the only affirmative conduct by the City on which Triangle Center purportedly relied was the notation "parking lot" under "[a]pproved use" in the 1987 order to comply. The court said this " 'action' " by the City was "isolated and perfunctory" and could not reasonably be relied upon. The court therefore concluded that the evidence did not support the planning commission's finding that the City acted in a manner that justified Triangle Center's reliance. The court also concluded that the planning commission's findings did not support its decision.

In light of those conclusions, the trial court said it did not need to "address the balance of private injustice and public policy that would be required if th[e] elements [of equitable estoppel] were present." The court did, however, offer "[t]wo observations:" "First, the primary public policy at stake is that a public agency must be bound by its organizing statutory mandates and limitations." The court quoted *Smith v. County of Santa Barbara* (1992) 7 Cal.App.4th 770, 775 (*Smith*): "[P]ublic policy may be adversely affected by the creation of precedent where estoppel can too easily replace the legally established substantive and procedural requirements for obtaining permits." Second, the court noted the grave injustice that would have resulted had the government not been estopped in *City of Long Beach v. Mansell* (1970) 3 Cal.3d 462 (*Mansell*) involved "thousands of homeowners." The trial court said Triangle Center's reliance on the City's inaction in not seeking a certificate of occupancy and in spending money to restripe the parking lot was "a far cry from the situation" in *Mansell*. The court found "the potential for further injustice" from the possibility of increased traffic and street parking in the neighborhood to be "speculative."

9

For all of these reasons, the trial court concluded, the planning commission did not "appropriately invoke[] public agency estoppel."

4.    *Judgment and Appeal*

The trial court entered judgment on December 31, 2013, granting a peremptory writ of mandate directing the City to set aside the planning commission's decision upholding the restriping permit and to reinstate the zoning administrator's decision denying the permit. Triangle Center and the City timely appealed the judgment.

## CONTENTIONS

Triangle Center and the City contend (1) substantial evidence supports the planning commission's finding that the elements of equitable estoppel are satisfied; and (2) the circumstances here justify an equitable estoppel against the government.

## DISCUSSION

1.    *Administrative Mandamus Standard of Review*

Code of Civil Procedure section 1094.5 governs judicial review of a final decision by an administrative agency if the law required a hearing, the taking of evidence, and the discretionary determination of facts by the agency. (*Id.*, subd. (a).) The petitioner must show that the agency acted without or in excess of jurisdiction, failed to afford a fair trial, or prejudicially abused its discretion. (*Id.*, subd. (b).) An abuse of discretion is shown if the agency failed to proceed in the manner required by law, the decision is not supported by the findings, or the findings are not supported by the evidence. (*Ibid.*)

The trial court in an administrative mandamus proceeding exercises its independent judgment on the evidence only if the administrative decision substantially affects a fundamental vested right. (Code Civ. Proc., § 1094.5, subd. (c); *Bixby v. Pierno* (1971) 4 Cal.3d 130, 143.)[6] In all other cases, the court reviews the agency's factual findings under the substantial evidence test. (Code Civ. Proc., § 1094.5, subd. (c) ["abuse of discretion is established if the court determines that the findings are

---

[6]    Triangle Center and the City do not argue that a fundamental vested right is at issue.

10

not supported by substantial evidence in the light of the whole record"]; *Bixby*, *supra*, at p. 144.) "In reviewing the agency's decision, the trial court examines the whole record and considers all relevant evidence, including evidence that detracts from the decision." (*McAllister v. California Coastal Com.* (2008) 169 Cal.App.4th 912, 921 (*McAllister*).) Substantial evidence means evidence "of ponderable legal significance." (*Phelps v. State Water Resources Control Bd.* (2007) 157 Cal.App.4th 89, 99.) The evidence " ' " 'must be reasonable in nature, credible, and of solid value . . . . [Citation.]' " ' " (*Ibid*.)

Thus, a trial court in an administrative mandamus proceeding not involving a fundamental vested right does not act as a trier of fact. Instead, the court reviews the administrative record to determine whether substantial evidence in the record supports the agency's factual findings. The court also determines whether the findings support the agency's decision and whether the agency committed any legal error. (Code Civ. Proc., § 1094.5, subd. (b); *Bixby v. Pierno*, *supra*, 4 Cal.3d at p. 144.) An appellate court in a case not involving a fundamental vested right reviews the agency's decision, rather than the trial court's decision, applying the same standard of review applicable in the trial court. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427; *Antelope Valley Press v. Poizner* (2008) 162 Cal.App.4th 839, 851-852 (*Antelope Valley*).)

Questions of law, however, are reviewed de novo. (*Antelope Valley, supra,* 162 Cal.App.4th at p. 851.) "The trial court exercises independent judgment on pure questions of law, including the interpretation of . . . judicial precedent." (*McAllister, supra*, 169 Cal.App.4th at pp. 921-922.)

### 2. *Triangle Center Is Not Entitled to a Restriping Permit Based on Equitable Estoppel*

#### a. *Legal Framework*

The elements of equitable estoppel are "(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the

11

other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury. [Citation.]" (*Strong v. County of Santa Cruz* (1975) 15 Cal.3d 720, 725.) The detrimental reliance must be reasonable. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 35; *Windsor Pacific LLC v. Samwood Co., Inc.* (2013) 213 Cal.App.4th 263, 271-272.)

An additional requirement applies in cases involving equitable estoppel against the government. In such a case, the court must weigh the policy concerns to determine whether the avoidance of injustice in the particular case justifies any adverse impact on public policy or the public interest. (*Mansell, supra,* 3 Cal.3d at pp. 496-497; *West Washington Properties, LLC v. Department of Transportation* (2012) 210 Cal.App.4th 1136, 1149-1150 (*West Washington*); *Golden Gate Water Ski Club v. County of Contra Costa* (2008) 165 Cal.App.4th 249, 259-263 (*Golden Gate*).) Even if the four elements of equitable estoppel are satisfied, the doctrine is inapplicable if the court determines that the avoidance of injustice in the particular case does not justify the adverse impact on public policy or the public interest. (*Mansell*, *supra*, 3 Cal.3d at pp. 496-497; *West Washington*, *supra*, 210 Cal.App.4th at pp. 1149-1150; *Golden Gate*, *supra*, 165 Cal.App.4th at pp. 259-263.)

" '[T]he doctrine of equitable estoppel is founded on concepts of equity and fair dealing.' [Citation.] 'The essence of an estoppel is that the party to be estopped has by false language or conduct "led another to do that which he [or she] would not otherwise have done and as a result thereof that he [or she] has suffered injury." [Citation.]' [Citation.] The doctrine 'ordinarily will not apply against a governmental body except in unusual instances when necessary to avoid grave injustice and when the result will not defeat a strong public policy. [Citations.]' [Citation.]" (*Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1315.)

"The government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite to such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect

upon public interest or policy which would result from the raising of an estoppel." (*Mansell*, *supra*, 3 Cal.3d at pp. 496-497.) *Mansell* stated further, " '[t]he doctrine of equitable estoppel may be applied against the government where justice and right require it' . . . [but] an estoppel will not be applied against the government if to do so would effectively nullify 'a strong rule of policy, adopted for the benefit of the public . . . . ' " (*Id.* at p. 493, citations omitted.)

*Mansell*, *supra*, 3 Cal.3d 462, involved a dispute about boundaries between public tidelands and private lands. The state and the City of Long Beach had engaged in a "sustained course of conduct" (*id.* at p. 499) for several decades inducing thousands of people to settle on and improve property that they reasonably believed to be privately owned. (*Id.* at pp. 471-472, 492, 499.) The "haphazard and reckless" process of developing the area also "resulted in an area providing an impressive array of public facilities for navigation and recreation" with the great majority of the shoreline open and accessible to the public, mitigating any harm to the public. (*Id.* at p. 500 & fn. 34.) *Mansell* stated, "the rare combination of government conduct and extensive reliance here involved will create an extremely narrow precedent for application in future cases." (*Id.* at p. 500.) *Mansell* stated further, "we have concluded that the great injustice which would result in this case from the failure to uphold an equitable estoppel against the state and city justifies the minimal effect upon public policy which would result from the raising of such an estoppel—and therefore that this is one of those 'exceptional cases' where 'justice and right require' that the government be bound by an equitable estoppel. [Citations.]" (*Id.* at p. 501.)

Particularly in land use cases, "[c]ourts have severely limited the application of estoppel . . . by expressly balancing the injustice done to the private person with the public policy that would be supervened by invoking estoppel to grant development rights outside of the normal planning and review process. [Citation.] The overriding concern 'is that public policy may be adversely affected by the creation of precedent where estoppel can too easily replace the legally established substantive and procedural requirements for obtaining permits.' [Citation.] Accordingly, estoppel can be invoked

13

in the land use context in only 'the most extraordinary case where the injustice is great and the precedent set by the estoppel is narrow.' [Citation.]" (*Toigo v. Town of Ross* (1998) 70 Cal.App.4th 309, 321 (*Toigo*).)

Zoning laws concern "a vital public interest—not one that is strictly between the municipality and the individual litigant. All the residents of the community have a protectable property and personal interest in maintaining the character of the area as established by comprehensive and carefully considered zoning plans in order to promote the orderly physical development of the district and the city and to prevent the property of one person from being damaged by the use of neighboring property in a manner not compatible with the general location of the two parcels. [Citation.] These protectable interests further manifest themselves in the preservation of land values, in esthetic considerations and in the desire to increase safety by lowering traffic volume. To hold that the City can be estopped would not punish the City but it would assuredly injure the area residents, who in no way can be held responsible for the City's mistake. Thus, permitting the violation to continue gives no consideration to the interest of the public in the area nor to the strong public policy in favor of eliminating nonconforming uses and against expansion of such uses. [Citations.]" (*Pettitt v. City of Fresno* (1973) 34 Cal.App.3d 813, 822-823.)

The existence of equitable estoppel generally is a factual question for the trier of fact to decide, unless the facts are undisputed and can support only one reasonable conclusion as a matter of law. (*Platt Pacific, Inc. v. Andelson* (1993) 6 Cal.4th 307, 319; *Albers v. County of Los Angeles* (1965) 62 Cal.2d 250, 266.) We review factual findings regarding the existence of equitable estoppel under the substantial evidence test. (*Hopkins v. Kedzierski* (2014) 225 Cal.App.4th 736, 756.) In a case involving equitable estoppel against the government, however, the existence of estoppel is in part a legal question to the extent it involves weighing policy concerns to determine whether the avoidance of injustice in the particular case justifies any adverse impact on public policy or the public interest. (*Lentz v. McMahon* (1989) 49 Cal.3d 393, 403; *Feduniak v. California Coastal Com*. (2007) 148 Cal.App.4th 1346, 1360 (*Feduniak*); see also

14

*Smith, supra,* 7 Cal.App.4th at p. 776 ["Whether the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify the effect of the estoppel on the public interest must be decided by considering the matter from the point of view of a court of equity"].)  As noted, we review questions of law de novo. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 801; *SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 461.)  We find this legal question dispositive here.

b.     *No Exceptional Circumstances Justify Equitable Estoppel in This Case*

We will assume for purposes of argument that the City in its contacts with the owners of lots 70 and 71 caused them to believe that their use of the property as a parking lot was approved, that the owners reasonably relied on those express or implied representations by not seeking a certificate of occupancy at a time when they could have received one on request, and that they spent money paving and restriping the parking lot.  A finding of no equitable estoppel would deprive Triangle Center of a right of use that it otherwise would enjoy and -- according to Triangle Center and the City -- could adversely affect traffic and commercial and residential land uses in the neighborhood by reducing the amount of off-street parking.

Nevertheless, in light of all of the circumstances, we conclude that no grave or great injustice will result from the failure to apply equitable estoppel in this case, and the avoidance of injustice does not justify overriding the current zoning restrictions and the normal land use approval process.  To establish a right of use based on equitable estoppel in this case would undermine the strong public policy in favor of enforcing the substantive and procedural requirements for land use approvals.  (*Toigo*, *supra*, 70 Cal.App.4th at p. 321; *Penn-Co v. Board of Supervisors* (1984) 158 Cal.App.3d 1072, 1082-1084.)  Triangle Center argues the denial of estoppel would "work a grave injustice" on it by "potentially render[ing] the parking lot unlawful, jeopardizing [its] ability . . . to continue leasing the Property to retail tenants."  This is a purely economic hardship on an entity that failed to seek a certificate of occupancy, as required by law.

15

Courts have found much more severe financial hardships not to constitute "grave injustice" in the land use context. (See, e.g., *West Washington, supra,* 210 Cal.App.4th 1136 [estoppel properly denied where building owner had permits from city but not state for "wallscape" on building even though wallscape had been in existence for more than 20 years and owner would lose 12 million dollars]; *Golden Gate, supra,* 165 Cal.App.4th at pp. 259-263 [estoppel properly denied where nonprofit had built more than 28 residences on island over nearly 40 years; "[a] party 'faces daunting odds in establishing estoppel against a government entity in a land use case' "]; *Feduniak, supra,* 148 Cal.App.4th 1346 [estoppel properly denied where homeowners bought property with golf course that had been there 18 years within plain view of commissioners, even though removal would cost $100,000]; *Smith, supra,* 7 Cal.App.4th at p. 775 [estoppel properly denied where company sought and obtained land use permit and building permit for microwave towers and "made substantial expenditures" in reliance on those permits; not an "extraordinary case" like *Mansell*; permitting estoppel "would establish a broad precedent allowing government to operate in violation of its own laws"]; *Pettitt v. City of Fresno, supra,* 34 Cal.App.3d at p. 822 [estoppel properly denied even though property owners had obtained building permit and temporary certificate of occupancy for beauty salon, inspectors had approved work, and owners unsuccessfully had applied for variance; "[i]n the field of zoning laws, we are dealing with a vital public interest -- not one that is strictly between the municipality and the individual litigant"].)[7]

---

[7]    A number of the cases Triangle Center cites are not land use cases, or even government estoppel cases.  A land use case it does cite, *City of Imperial Beach v. Algert* (1962) 200 Cal.App.2d 48, is distinguishable. There, a 1948 map showed a street called Delaware.  The 140-foot strip dead-ending into an alley never actually opened as a street; indeed, a concrete curb blocked its entrance.  The county always had treated the strip as private property, not a public street.  The city's official map never showed the parcel as a street.  Algert bought the property in 1956.  Sometime later the city sued Algert to quiet title.  The court found the city and county "over a period of many years" had "clear[ly] affirmative[ly] reject[ed] . . . [the strip's] acceptance as a street." (*Id.* at p. 52.)  Unlike Triangle Center's failure here to apply for a certificate of occupancy,

16

The City never uses the term "grave injustice" in its briefs. The City asserts that, if it is not estopped from enforcing the municipal code, "the community would be harmed by extra traffic and lack of off-street parking." The same could be said of any case involving the closing -- or denial of permitting -- of a parking lot. Conflicts between businesses and their customers and homeowners who live next to the businesses are common. Sorting out these competing and conflicting interests and concerns is what zoning authorities do. The public has a strong and vital interest in the enforcement of the land use laws enacted by its elected representatives: here, the Los Angeles Municipal Code. For this reason, as this court has noted, "the vast majority of cases . . . hold that a governmental entity is not estopped from enforcing the law." (*Smith, supra,* 7 Cal.App.4th at p. 776.)

In sum, although Triangle Center and the City claim that continued use of the property as a parking lot would serve the public interest, that determination should be made through the planning and zoning process or on an application for a conditional use permit or a variance. We are aware of no reason that the City, upon due consideration, could not make such a determination in the appropriate manner without relying on equitable estoppel.

For all of these reasons, we conclude that this is not "one of those 'exceptional cases' where 'justice and right require' that the government be bound by an equitable estoppel."[8] (*Mansell*, *supra*, 3 Cal.3d at p. 501.)

---

Algert had not failed to seek any necessary permits for his property. Nor does the decision reflect any demand by other citizens for access to the strip as a street. Here, neighbors and customers of the 99 cent store hotly debated the benefits versus the burdens of the parking lot. Those debates are best suited to the land use approval and zoning process where conflicting interests can be considered on their merits.

[8] In light of our conclusion, we need not address Triangle Center's argument that the trial court committed legal error by concluding that equitable estoppel must be based on affirmative conduct rather than inaction.

## *DISPOSITION*

The judgment is affirmed.  Petitioners are entitled to recover their costs on appeal.

EGERTON, J.*

WE CONCUR:

EDMON, P. J.

KITCHING, J.

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 6/19/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CARL SCHAFER, Individually and as Trustee, etc. et al., | B253935 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BS137297) |
| v. | |
| CITY OF LOS ANGELES, | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendant and Appellant; | [NO CHANGE IN JUDGMENT] |
| TRIANGLE CENTER, LLC, | |
| Real Party in Interest and Appellant. | |

THE COURT:

The opinion in the above-entitled matter filed on May 20, 2015, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

[There is no change in the judgment.]